Good morning, Your Honors. Peter Klee on behalf of Appellant and Allstate Insurance Company, and what I'd like to do is reserve seven minutes, if I may, for both rebuttal and to respond to any arguments regarding the Plaintiff's Cross-Appeal. Yeah, I think this case really doesn't require that 20-minute allocation. I understand the legal issue, and the facts are not that complicated, and the law is not that complicated. The answer may be complicated. The answer may be difficult or not, but it's not a case that requires an excessive amount of argument. Your Honor, I'd like to present my arguments, and if I can be efficient and save time, I certainly will, but I'm going to be extremely efficient in presenting what I have to say. Good. And I just want to draw a few things to the Court's attention. First of all, just to give this case context, this is not a case about an insurance company that adamantly refused to settle a case and insisted on going to trial so that it could roll the dice. Well, they turned down that one offer, and then they made, what, 12 repeated offers or something of that kind? They did. That's correct, Your Honor. Was that right, the number 12? Twelve offers after the February 19, 2010 offer. I've never heard or seen that circumstance before, and they turned them down repeatedly, right? The claimants turned down every single offer that Allstate made. They did not accept the first policy limits offer on January 29. They did not accept or even respond to the second revised offer Allstate made on February 4, 2010, and they rejected Allstate's, when Allstate put the policy limits back on the table on February 19, the claimants refused to accept them. And they refused to accept them on two technical grounds. One, on a technical application of the rules relating to contract and acceptance, and second, because the third offer was a mere four days after the arbitrary deadline that they had set forth in their demand. And if this Court were to apply the rules that govern the duty to settle, I think the Court will see that the case and the judgment have to be reversed. And even putting aside the rules that govern the duty to settle, if this Court just looks at the spirit and the intent behind bad faith law, which is not to protect claimants and to enrich claimants, but rather to encourage settlements and to prevent insureds from being dragged through the litigation process, the Court will see that that is another reason why this case should be reversed. Because this is an example of a claimant who attempted to use a law that was designed to encourage settlements and protect insureds to get the exact opposite result. I want to focus my argument on two fundamental issues. The first is the fact that it is undisputed that a demand is not reasonable and therefore cannot take the cap off an insurance policy if it doesn't offer a release of all insureds. It is undisputed in this case that the one and only settlement demand that was made by the claimant did not offer to release one of all states' potentially liable insureds, in fact, an insured who was later sued, and that was Mrs. Tang. In fact, the plaintiff's own expert admitted that acceptance of the one and only offer that was ever made would not have resulted in an enforceable contract to release Mrs. Tang. And the plaintiffs haven't disputed... She was an insured also. She was an insured, yes. She had liability for several reasons, and she was sued for several reasons. She was the registered owner of the vehicle, she was Mr. Tang's employer, and Mr. Tang was delivering something to the restaurant that she owned at the time of the accident, and so she had potential liability. But this isn't a case where Allstate received an unacceptable demand, unacceptable because it could not, it did not allow for the release of all insureds and did nothing. No. Allstate responded with offer after offer, each of which responded or addressed the deficiency in the demand. Three separate offers in a span of approximately three weeks. And the final offer of those three on February 19 was less than 30 days after Allstate received the very first piece of information it ever received, implying that it's insured Mr. Tang might have liability. And that was undisputed. So we're talking about an insurance company that within less than 30 days tenders three different policy, three different offers, two of which are for the policy limits, that address the deficiency in the demand. And just in terms of the timeliness of that, the Department of Insurance has set forth what is a reasonable time for an insurance company to settle, and that's 40 days. Well, all of these three offers occurred in less than 30 days, to give it context. But here's the problem. The claimant's attorney acknowledged at trial that when he received the first of Allstate's offers on January 29th, he realized that the claimant's attorney was not going to be able to do that. He realized that there was another insured that needed to be released. He acknowledged that at trial. That was undisputed. But what did he do? He did nothing. And here's what the law told him he had to do, and I'm referring to the Coe versus State Farm case, which is cited in our papers. It addressed that exact situation. It said that if a demand is deficient, once that deficiency is brought to the claimant's attention, the claimant has an obligation to do one of two things, if it wants to argue bad faith. It has to either make a new demand that addresses the deficiency, or it has to notify the insurance company that it's revising its existing demand to address the deficiency. Those are the requirements. What it cannot do is sit back and do nothing and then later argue that the cap's off the policy because the unacceptable demand was not accepted. Here, Mr. Madison, the claimant's attorney, did exactly what the law forbids. He made no attempt or effort to correct the deficiency. Instead, he sat back and then waited and then took the position on February 19th that the cap was off the policy and he refused to settle. And he did also what the intent of bad faith is designed not to do. Not only did he refuse to settle, he went forward, filed a lawsuit against the insured, and prosecuted it to judgment. The only argument that the plaintiffs have in response to this fundamental defect in their case is that Mr. Madison had an undisclosed, subjective intent to include all insureds in the settlement. It's undisputed that that was undisclosed and subjective, and they next, they take that and they say, therefore, it was incumbent on Allstate to conform with the so-called duty to clarify that insurance companies have when they receive ambiguous demands. Well, the fundamental problem with that argument is that the district court on two occasions refused to provide a duty to clarify instruction to the jury. Now, why did the district court do that? Because the district court found, because that was what the evidence showed, the demand was not ambiguous. Allstate didn't believe the demand was ambiguous. And Allstate actually took affirmative steps to address the deficiency, which is what an insurance company is required to do. The insurance company got a demand that it didn't understand and sat back and did nothing. It either ignored the demand entirely or it rejected the demand. That's not what happened here. Allstate did exactly what an insurance company should do if it receives an ambiguous demand. But again, this was not an ambiguous demand. This was a demand, it required strict compliance, mere image acceptance, and it did not include Mrs. Tang, and that was not disputed at trial. So I want to make one big point on this issue, and then I'll move to the second point that I'd like to discuss, and that is this. Either the demand was unreasonable as a matter of law because it did not include all insureds, and I believe that is the court can look at the demand and it doesn't release all insureds. But if the court wants to accept the plaintiff's argument that Mr. Madison's subjective undisclosed intent that he would have released had Allstate sought clarification, if the court wants to accept that argument, the case still has to be reversed. And the reason why is the jury was never provided with an opportunity to address that argument. What do I mean by that? The jury was never instructed that a demand has to include all insureds. Allstate requested that instruction and the judge declined to do it. And in fact, the reason the judge declined is because the plaintiffs argued that telling the jury that the demand requires a release of all insureds would be tantamount to giving the jury a directed to basically would be tantamount to a directed verdict in favor of Allstate. That was the position the claimants took. And in response to that position, the judge took that element out of the jury instruction. But that's not all the judge did. The judge also did not instruct the jury on the duty to clarify. So the jury needed to know, number one, that a demand has to include all insureds and that, number two, if it's uncertain whether it includes all insureds, then it needed to know what obligations an insurance company has to seek clarification so it could evaluate whether Allstate took those steps. Those instructions were not given. So for either of those two issues, the judgment should be reversed. And I would suggest, Your Honors, that the easiest ground for reversal is on the mere fact that the demand did not include all insureds on its face, a strict compliance demand that specifically stated that any counteroffer would be deemed rejected. So there wasn't any room to negotiate per the terms of the demand. But if the Court doesn't find that the demand clearly excluded Mrs. Tang and that there was some uncertainty, then it still needs to be reversed so the jury can evaluate whether there was such an uncertainty and whether Allstate complied with its obligations. The second issue that I want to talk about is another reason why the judgment should be reversed, and that is another fundamental principle relating to the duty to settle, which is that regardless of whether an insurance company acts reasonably or unreasonably, if a demand cannot be accepted for reasons outside the insurance company's control, then the insurance company can't be liable for bad faith, even if it engages in unreasonable conduct. And why does that issue come up here? It comes up because one of the conditions of the strict compliance demand was that there was an asset sheet, meaning he disclosed his assets. There are five separate undisputed facts that took place during that trial that mandate judgment in favor of Allstate on that issue, and I'll just walk through them very quickly. First, it's undisputed the demand required an asset sheet from Mr. Tang. Second, it's undisputed that Allstate forwarded the demand to the Tangs, and so they could see the requirement. Third, it's undisputed that the Tangs were aware that the claimant was demanding an asset sheet. They specifically testified that they knew that one of the requirements of the demand was the disclosure of Mr. Tang's assets, and it's also undisputed that the Tangs never expressed any confusion to Allstate on that topic. In fact, to the contrary, and this is the fifth undisputed fact, Allstate repeatedly recommended to the Tangs that they either consult with a lawyer, Mr. Tang had a lawyer at the time, or that they talk to some other advisor to advise them regarding the asset issue, and their response was that they didn't want to because they didn't need to. And so there's – and then the fifth fact, of course, is that they never provided an asset sheet. They didn't provide an asset sheet within the 30-day deadline required by the claimant, nor did they provide an asset sheet all the way up until today. It has never been provided. And the only argument that the claimants, the plaintiffs, have made against this fundamental defect in their case is that, well, the Tangs didn't understand that they needed an asset sheet. But that is – but again, the undisclosed subjective confusion of an insured is not sufficient to impose bad faith liability, in this case a $15 million judgment, on an insurance company, especially where the insurance company has provided and disclosed all of the information necessary to the insured and has recommended that the insured seek consultation, and the insured has affirmatively told the insurance company that it does not want to seek any consultation on it. And so that is the second separate and independent ground. And related to that ground is the fact that, over all states' objection, the district court did not instruct – did not include in the special verdict form one of the fundamental elements of a bad faith failure to settle claim, which is proximate causation. All state requested that the court instruct the jury that – I'm sorry – that they put in the directed verdict form the causation element, and the court declined to. And that's one of the grounds for appeal, because the law is, in the Ninth Circuit and elsewhere, that when you have a special verdict like we had here, you have to put in the cause of action. And here, one of the most critical elements was the causation element, because as I've indicated, regardless of whether all state acted unreasonably, regardless of whether any of its many counteroffers, one of them was reasonable or unreasonable, it didn't matter, because the – because the Tangs never provided the asset sheet that was a requirement of consummation of any settlement. The only argument that the Plaintiffs have raised in response to that is that it wasn't really a special verdict form, it was a general verdict form. And we addressed that in our papers, but just to – just to summarize, it – the district court itself found that it was a special verdict form. The district court called it a special verdict form, analyzed it in procedural motions as a special verdict form, and the form itself was a special verdict form because it didn't simply say, in whose favor do you find, ladies and gentlemen. Instead, it walked through specific factual elements of the cause of action. So by refusing – by excluding that fundamental element, which in this case was extremely important for the reasons I've indicated, that was another reason why this case should be reversed if the court doesn't reverse it and enter judgment to be entered in favor of all state on the ground that as a – as a matter of law, it did not act in bad faith because it's undisputed that the Tangs never provided all state with an asset sheet, which was a fundamental element of the claim. So those are the two separate and independent grounds. The demand did not include a release, and therefore it could not be acceptable. It was unacceptable as a matter of law. And second, that the asset sheet was never provided, and therefore regardless of all state's conduct, it could not have consummated a settlement in response to the one and only settlement demand that was made. And I'd like to reserve time for rebuttal to, like I said, a couple minutes for rebuttal and also to address any arguments that are made regarding the prospect. You have three minutes for rebuttal. Thank you. May it please the Court, Jeffrey Ehrlich for the appellee and cross appellants Madrigal and Tang. I didn't believe that all state would actually present the case to you in oral argument without mentioning the critical fact that on January 29, it offers the policy limits, and then six days later in writing, it withdraws the policy limits and says, we're not going to pay you $100,000. All we're going to pay you is $34,398. That is a rejection by any measure of the demand. And all state doesn't talk about it because it's a horrible fact. It's a critical fact in this case. But it's something that does have to be turned about, talked about, because it creates the factual issue that allowed the jury to rule against all state here, and it completely precludes all state from arguing, as it does, that it's entitled to judgment as a matter of law. I want to be very clear, because Mr. Klee just kept talking about reversal, but the first arguments that he was making, the arguments about the asset sheet, the arguments about including Mrs. Tang as a release, those are arguments that all state is contending entitled it to judgment as a matter of law, that the case should never even gone to the jury. The only argument that it talks about for a new trial deals with the form of the special verdict. So now, let me talk about, or I'll address the claims that all state was entitled to judgment as a matter of law. First of all, with respect to the failure to disclose the assets in the asset sheet. And Mr. Klee says, to this day, Mr. Tang has never disclosed assets. Well, that's right. And if Mr. Tang walked on the way out of court, handed Mr. Klee an asset sheet, it wouldn't matter. The reason it wouldn't matter is that once all state, on February 4th, scuttled the settlement and said we're not going to pay policy limits for this claim, there was nothing left. It didn't matter. Well, but the offer to settle had certain requirements. And I'm wondering whether it makes any difference at all whether all state said no, we're not going to pay 100, we're not going to pay anything. The offer was, if the offer was, defective in the first instance, and it's essentially void ab initio. Well, Your Honor, that's really not the law. It wasn't defective at all. The law in this... That's what you've got to address. All right. Because the issue here is, I'm having a hard time, and maybe counsel is incorrect, but if you make an offer to settle, and they're representing multiple plaintiffs, and you offer to settle with one or two of those plaintiffs, somehow your undisclosed intent, not you, but counsel's undisclosed intent, well, I really meant, I know I didn't tell the insurance company, I know I didn't tell the other side, but I really meant I was going to cover everybody. That doesn't fly. Judge Ezra, that's not the argument. That's not how the posture of this case is. What happens is all state, on January 29th, writes a letter and says, we will accept. We're offering our policy limits. Now, in the letter, they don't say, oh, and by the way, there's another insured, Mrs. Tang. And the district court found that all state, and all state had deliberately tried to hide the existence of Mrs. Tang from Madrigal. They had written seven prior letters, and they always refer to their insured as Mr. Tang. Even their January 29th letter does that. And the letter itself doesn't say, oh, there's another insured, are you willing to release her? But instead, they say, we'll offer, we accept, here's the release that you asked for, and the release includes Mrs. Tang. Now, this is what's critical. At that point, they've said, here's the release we want. So if this were a case where Madrigal's lawyer, the next day, had faxed an irate letter saying, oh, I never offered to release Mrs. Tang, and so therefore, the policy's open because this was a rejection and a counteroffer, that would be a different case. But what happened is nothing. Nothing. He got the release. All state's letter of January 29th said, we're waiting to hear from our insureds about this last condition, the asset sheet. So that's what everyone was doing, waiting to see what would happen. And then, six days later, on February 4th, all state decides, you know, we don't want to pay $100,000. Let's see if we can save some money. Let's save $66,000. We withdraw our agreement to pay the $100,000. We're not going to do it. At that point, there's nothing to accept. But the only way that all state can rely on the absence of Mrs. Tang or an offer about Mrs. Tang, which they acknowledge that Madrigal didn't even know about, would be if they brought it up. And then, having brought it up, the reason the case didn't settle is because Madrigal said, I'm not going to release Mrs. Tang. But that's a counterfactual example. That's not what happened here. Here, all state had an opportunity to settle. It was waiting to hear about the asset sheet. It discloses Mrs. Tang in the release. And then, before anything happens, it blows up the settlement. I understand your explanation. Let's step back again to one level back. And there we have, let's assume for a moment that somebody at all state, whoever, takes a second hard look at this and says, this adjuster, whoever was dealing with this, has really made a bad mistake. We need to offer full policy limits. So within a relatively short period of time, they turn around and they do just that multiple times. And the other side says, well, sorry. We gave you your opportunity. You turned it down too bad. Okay, well, they have the right to do that. But where's the bad faith? The bad faith is in rejecting a reasonable policy limits demand when they had an opportunity to accept it. So you want, essentially, what you're telling us is you want us to find, and maybe you're right, that if an insurance company, within a relatively short period of time, makes a bad decision in turning down, from your perspective, turning down an offer, realizes that was a wrong decision, but then rectifies it by making a full policy offer too bad. What I'm telling you, Your Honor, is when the insurance company, so the answer is no, that's not my position. Well, it is. No, Your Honor, please. Because what you said is that they turned down the offer and that's it. So there's no question that they came back multiple times later, and within a relatively, certainly within 40 days, within 30 days, and said, we'll pay the entire policy limits, and the lawyer said, too bad, no other explanation other than you had your shot, we're not giving you another shot. That's fine. He has every right to do that. Right. But the next question is, is that bad faith? You may be right. Maybe it is bad faith. Your Honor, the point that I want to get out is that I'm not saying, and when I said that's it, when all state does that, when they reject it, and then they change their mind, and they, after the offer expires, and they relatively quickly try to correct it, the law is that the correction doesn't, as a matter of law, mean that they acted in good faith. It creates a triable factual issue of whether they acted reasonably or not. That issue went to the jury. All state was allowed and got a chance to argue, look at the complete sweep of the circumstances in this case, and if you find that we acted reasonably and we think we did, look how quickly we changed our mind, then we acted reasonably. The jury could have done that. Okay. I'm not, look, you know, I taught law for 34 years, so I like to ask a lot of questions. Okay. We're in a, let's assume here, though, that we're in this, well, we don't have to assume, this is the situation we have. We're in a situation where the policy, the general policy, I'm not talking about insurance policy, the general policy behind bad faith, and counsel was correct, is to induce insurance companies to do what they're supposed to do. We want insurance companies to pay appropriate policy limits, and we want there to be a penalty when they refuse to do so. Do we really want to be in a position where, and does the law compel us to be in that position, where an insurance company makes a mistake, then quickly realizes it, rectifies it, and makes a full policy offer? Do we want insurance companies to say from now on, well, now we've discovered our mistake, but it's too late, we're not going to make our full policy offer any longer, because what the heck, we're going to get sued anyway, and it may be at admission, so we won't do it. Because that's what the end result of this would be. All right. First of all, this isn't a, you're not writing on a completely clean slate here. There's a case that we've cited from 1964 called Critts v. Farmers. It's one of the foundational bad faith cases in California. And in Critts, the insurance company had evaluated the case. There was no litigation pending yet. They knew that the claim exceeded the $10,000 policy limits. And before a lawsuit was filed, they got a policy limits demand with a seven-day deadline. And they said, we'll offer you $82.50. And the Critts court said that Farmers chose to expose its insurer to potential liability running at tens of thousands of dollars in order to squeeze out a $1,750 saving for itself, and instead of giving its insured's interest equal consideration for its own, it threw its policy holder's interest to the four winds. Now, when you say that Farmers made a mistake, I'm sorry, I'll say made a mistake. I want the record to be very clear here. There was never indication that this adjuster somehow mistakenly did something at any point without having full authority and discussing it with her supervisors at every step of the process. It's not like you go to Walmart and a security guard slaps someone and then you say a Walmart policy to assault. All stayed here at every step, made considered decisions about what it would do with the claim. It understood the policy underlying bad faith law. The fundamental policy is that the insurance company controls whether to settle or not. That's in its power. And it has an obligation that's correlative with that duty to make a decision to protect its insured's from an excess judgment. So when it has an opportunity to settle within policy limits, if it's a reasonable offer, it has to take it. This is the textbook example of what happened in that case. Farmers Allstate got this policy limits demand. It knew that the claim, the $100,000 policy, was, as Mr. Gelatly wrote, the claim's supervisor, adjuster, that the damage was to be exponentially higher. So that's why they offered the $100,000. Then the adjuster thought, you know, I think we can get it for less. I'm going to withdraw it. She went to her supervisor and said, I want to take that offer off the table. The supervisor said, okay. So they change the offer, they withdraw it, and they offer $34,000. It's exactly like Critts. They were trying to squeeze out some savings. And what Critts says is that when you do that, the Critts court said, failure to settle may occur late or early in the game. The court went on to say that the injured party is under no duty to keep negotiations open after rejection of an early settlement offer. Well, in Critts, was there a subsequent full policy offer? I believe there was. There was? Multiple occasions? Pardon? I don't know if they kept asking. But the point in Critts is that once the insurance company ---- My recollection of the facts were ---- Pardon? Of that case were not. But I may be wrong. I could certainly be wrong. There wouldn't have been an issue in Critts about whether they had the duty to keep it open because there were subsequent attempts. The insurance company figured out, you know, we didn't do the right thing here. But the bottom line is that Allstate had an opportunity to protect its insured. And for the only reason that it chose not to deliberately was to squeeze out some savings. And so under California law, that's a risk that it takes that if it says we're going to reject your $100,000 and we're not going to pay $100,000, the claimant is allowed to say, okay, we get to go to trial and see what happens. And if there's an excess judgment, that's your problem. Now, the carrier can say, oh, maybe we made a bad decision. Let's see and offer the policy later. But the claimant is not under a duty to accept it. And ultimately, and this is, I think, the critical point, we cite the Court in our briefing to a very recent 2016 California court of appeal case called Barrickman where there the insurance company settled, offered policy limits within nine weeks but then they kind of dithered about what the language of the releases was. And ultimately, the claimant said, I'm going to walk away and did. And then they got a $3 million judgment. And the carrier made exactly the argument that Allstate makes here, that as a matter of law, when we act reasonably and offer our limits quickly, that's it. That's all you look at. And the Barrickman court said, no, you have to look at all the circumstances.  And if the jury finds that that was not a reasonable thing for the carrier to do, then there's a bad faith judgment. So the issue here is one of substantial evidence. And whether there's substantial evidence to support the jury's verdict that Allstate acted unreasonably. I'm just stuck with crits now. I'm sorry. Acted unreasonably. And so we're not the ones saying that we win as a matter of law or that we should have won as a matter of law. But the law is very clear on these facts, that when Allstate has the opportunity to settle, and then 10 days before the offer expires, pulls it off the table and says, we won't pay you the policy limits, even though they know that the claim's worth multiples of the policy limits. That is, at least creates the tribal issue about bad faith. So it went to the jury. And the jury ruled against them. And I think you have to affirm that. You can't say as a matter of law it was good faith. The Barrickman Court specifically rejects that argument. While I have some time, I'd like to talk about two things. First of all, on the new trial motion and the alleged special verdict form. Rule 49A deals with special verdicts. And as I'm sure you know, special verdicts don't require the jury to apply law to fact. They require the jury to find the facts. And then the district judge fills in and applies the law. And so it makes sense that if you leave out a critical factual finding in a special verdict form, that could be an issue. General verdicts don't work that way. They just require law to fact. And it's not just who wins. There can be special interrogatories, and they can explore some facts. But the critical issue, as this Court held in the Zhang case, it's a functional test. What was the jury required to do? If it was given jury instructions on the law, if it was told that it's going to apply law to fact, then that's not a special verdict. And the rules requiring special verdict forms don't apply. And so the jury here was instructed in the jury instructions, instruction number one. This is in 2 SCR 50 and 51. It is your duty to find the facts from all the evidence in the case. To those facts, you will apply the law as I give it to you. You must follow the law as I give it to you, whether you agree or not. The Sixth Circuit, in a case called Portage II v. Bryant at 899 F. 2nd, 1514 at 1521, said that when a jury is given that instruction to apply law to fact, whether it has to apply the law and follow the law, whether it cares to or not, and it's given substantial jury instructions, that belies any suggestion that you have a special verdict. So the rule that Allstate's asking for doesn't apply. Moreover, there's no prejudice. The only reason there could be prejudice is if somehow the jury verdict form that was given would not have allowed the jury to find in Allstate's favor on the defenses it asserted. And that's not the case here. If Allstate, if the jury wanted to find, if Allstate claims that the demand was defective or had too many conditions, then question number one, the jury would have said, no, it wasn't a reasonable demand. And if they had wanted to say that, well, it wouldn't have settled or Allstate behaved reasonably, then they would have answered question number two for Allstate. So the verdict form captured Allstate's defenses. In my remaining time, I want to talk briefly, obviously, about the cross appeal. Allstate has never attacked the fundamental argument that we make, which is that the damages in a bad faith case extend to the interest that accrues on the underlying State court judgment. And the district judge accepted that and included $3.7 million in interest. The flaw, and Allstate doesn't appeal that, the flaw is that the district judge believed that when she entered the Federal judgment, then that damage was no longer to be captured in the judgment. And under the Carpenter case from the Eighth Circuit, the court in the Eighth Circuit held very clearly that that's not correct, that as long as the underlying judgment, Mr. Tang's, the judgment of Madrigal against Tang in the personal injury case continues to accrue interest, which it does, the damages will include that and should be included in the bad faith judgment. So at a conceptual level, Allstate doesn't have a problem with that. It says, well, this case is different. It's distinguishable. Not that you shouldn't follow Carpenter as a matter of policy, but it's distinguishable because here there's no real proof that the damages will continue to incur because as long as the agreement, the deferral agreement between Madrigal and Tang said if they won anything, then Madrigal wouldn't enforce it. And as we've put out and explained very clearly in our briefing and particularly in the reply brief, the word prevailed is different than the legal term of art prevailing party. We didn't use prevailing party. We'll give you another 30 seconds. All right. Thank you, Your Honor. We didn't use prevailing party. It simply says prevail. The leading definition in Black's Law Dictionary of what it's to prevail in a lawsuit means is to win the lawsuit, to get the relief that you asked for. That what was pled in the bad faith claim. We want to recover all of the interest that accrues, and therefore under Carpenter the judgment here should be modified to include not just the interest that accrued up to the time of entry of federal judgment, but as damages to include the ongoing interest. And I think the issue is very clearly stated in our briefing. I don't think that all State has given you any reason not to follow Carpenter here. I appreciate your comment. Thank you. Thank you, Your Honors. I'm going to be very brief because I want to give my colleague just a couple minutes to address the cross-appeal. So I'll be very brief. You have only three minutes total. Excuse me? You have only three minutes total. I'll be quick then, Your Honor. Judge Ezra, you were correct about Critts. In that case, the insurance company did not make a settlement offer in any sort of reasonable time. My recollection. Correct. In fact, the case went to litigation, and it only made it much, much later after the case already went to litigation here. The offer was made within 30 days of the first evidence of liability, and no lawsuit had been filed. And in fact, no lawsuit was filed for several months after the policy limits offers were made. The $34,000 offer that Allstate made, that represented 100% of the known medical expenses, the proven medical expenses, and it came with a statement that if you have any other evidence of additional medical expenses, let us know so we can reevaluate. But in any event, that was an offer that was made when there was no acceptable demand on the table for the reasons that I've stated. The Barrickman case, with all due respect to my opposing counsel, it is not on point. It has nothing to do with this case. In that case, the insurance company was held liable because it would not address the problem with the demand. It did not take any efforts to solve what it believed to be a problem. And in fact, the court of appeal found that that so-called problem was not even a problem and that the insurance company could have accepted the demand when it was first made. That's not what we have here where Allstate made a policy limits offer within 30 days of notice of liability without any strings attached other than that the settlement released Mrs. Tang. And there is no case anywhere holding that an insurance company can be in bad faith where it makes that type of good faith policy limits offer within 30 days, as Allstate did. Finally, on the proximate causation issue, there is a difference between the requirement that the insurance company act reasonably and that the conduct of the insurance company constitute the cause of harm. Opposing counsel has conflated them and said that because the jury decided the first reason, it must have decided the second, but there are two discrete elements. Let me turn this over briefly to my colleague on the cross-appeal issue. On the cross-appeal, Your Honor, the simplest reason to affirm the judgment in that respect is that there is no reasonable definition of the word prevail under which Mr. Madrigal, who proved liability on his sole cause of action and was awarded $13 million, did not prevail. Under the joint prosecution agreement, he prevailed. And if that part of the judgment is affirmed, Mr. Tang had no ongoing obligation, no ongoing damages. The second reason is that the stipulation between the parties was limited to allowing the court to decide issues of law contained within the parenthetical on the judgment, what interest and cost exist as issues of law. There was no stipulation to allow the court to try damages issue in the first instance. And if you look at page 13 of the supplemental excerpts of record, you'll see the court itself wrote that the only damages evidence offered at trial was the $10.5 million underlying judgment and nothing beyond that. Finally, if the court doesn't find this decided as an issue of law and there's a remand, it should be a remand for further proceedings on this so that all state can establish that this interpretation of prevail supposedly supported by a declaration from Mr. Tang who does not speak English, testifying to a nuanced understanding of the word prevail, is not entitled to evidentiary weight. Thank you, Your Honors. Thank you, Counsel. The case is there. It will be submitted.
judges: Reinhardt, Nguyen, Ezra